CLAMPITT et al. v. ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS et al.   (No. 8332.)

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 26, 1916. Rehearing Denied April 1, 1916.)

1. CARRIERS ⬤⇒209—CARRIAGE OF ANIMALS—CARS—"CLEAN"—"DISINFECTED"—"CLEANED AND DISINFECTED."

Under rule 31 of the State Live Stock Sanitary Commission, declaring that all cars for the loading of hogs shall be thoroughly cleaned and disinfected, the term "clean," in view of the use of the word "disinfected," does not neces-

sarily mean that the cars shall be free from all dirt, but that they shall be free from infection; the word "clean" being susceptible of many meanings, among them, free from defilement, while the term "disinfected" means free from injurious or contagious diseases.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 925; Dec. Dig. ⬤⇒209.

For other definitions, see Words and Phrases, Second Series, Clean.]

2. EVIDENCE ⬤⇒54 — PRESUMPTION ON PRESUMPTION.

Presumption cannot be based on presumption to make out a case.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 74; Dec. Dig. ⬤⇒54.]

3. CARRIERS ⬤⇒228(1) — CARRIAGE OF LIVE STOCK—ACTIONS—BURDEN OF PROOF.

In an action to recover the value of hogs which died of cholera during shipment, plaintiff, having averred that the cars furnished were not clean as required by rule 31 of the State Sanitary Stock Commission, has the burden of proving that allegation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 957, 958; Dec. Dig. ⬤⇒228(1).]

4. CARRIERS ⬤⇒228(5) — CARRIAGE OF LIVE STOCK—ACTIONS—EVIDENCE.

In an action where it was contended that because of unclean cars furnished, contrary to rule 31 of the State Sanitary Live Stock Commission, hogs contracted cholera, evidence held insufficient to show that the cars furnished were infected.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 960; Dec. Dig. ⬤⇒228(5).]

5. APPEAL AND ERROR ⬤⇒688(2) — EXCEPTIONS, BILL OF—NECESSITY.

Assignments complaining of improper argument of counsel cannot be reviewed, where the argument was not shown by bills of exception or the record proper.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 2896; Dec. Dig. ⬤⇒688(2).]

Appeal from District Court, Clay County; J. W. Akin, Judge.

Action by C. D. Clampitt and others against the St. Louis Southwestern Railway Co. of Texas and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

Templeton & Milam, of Ft. Worth, and W. T. Allen, of Henrietta, for appellants. Arnold & Taylor, of Henrietta, and Thompson & Barwise and G. W. Wharton, all of Ft. Worth, for appellees.

CONNER, C. J. The appellees, C. D. Clampitt, D. W. Clampitt, and Roy Williams, instituted this suit against the St. Louis Southwestern Railway Company of Texas, the Ft. Worth & Denver City Railway Company, and the Chicago, Rock Island & Gulf Railway Company, to recover damages in the sum of $2,647.65, which plaintiffs charged that they had sustained by reason of the wrongful and negligent action of the railway company first named in furnishing and using unclean cars for the shipment of two carloads of the plaintiffs' hogs shipped from Mt. Pleasant and Omaha, Tex., to Shamrock, Tex. It was alleged that the two several stock cars in which the several shipments had been made, and which had been furnished for that pur-

pose by the St. Louis Southwestern Railway Company, had not been properly cleaned and disinfected, by reason of which the hogs were exposed to and contracted the disease of cholera, from which most of them died. Mt. Pleasant and Omaha are located in Titus county, from which places the shipment proceeded to Ft. Worth, where they were delivered to the Ft. Worth & Denver City Railway Company, which received and transported the hogs over its line to Amarillo, at which point they were delivered to and received by the Chicago, Rock Island & Gulf Railway Company, which in turn transported them over its line to their destination at Shamrock. It was charged that one or both of the two defendants last named negligently exposed the hogs to cholera at Amarillo. The several defendants answered separately, and each for itself, among other things, denied the material allegations of the plaintiffs' petition. There was a trial before a jury which resulted in an instructed verdict for the intermediate and terminal carriers and a judgment on the findings of the jury in favor of the initial carrier. From the judgment so rendered, the plaintiffs have appealed to this court.

The principal question raised on this appeal is whether the evidence sustains the verdict of the jury in appellees' favor. The evidence is somewhat voluminous, and we will not attempt to set it all out. It has all, however, been considered, and our conclusion is that the verdict must be sustained. In order that the general character of the contest below may be understood, we will say that the proof undoubtedly was sufficient to establish the fact that the greater number of plaintiffs' hogs in both shipments died from cholera. The real contest in the evidence was whether the hogs became infected by reason of their shipment in unclean and disinfected cars, or whether, as was specially charged by the defendants, the hogs had become infected before their shipment ever began.

The hogs were purchased at Mt. Pleasant and Omaha, and in the vicinity of these towns, by a Mr. Minton, and it was shown by the plaintiffs that at the time of the shipments the State Live Stock Sanitary Commission had adopted rule 31, relating to the transportation of hogs, which had been put in force by the proclamation of the Governor of the state. This rule, so far as necessary here to set out, provides that:

"All swine imported into or moved within the state of Texas, when in carload lots, must be handled under the following regulations: (1) That cars assigned for the loading of stock hogs shall be thoroughly cleaned and disinfected. * * * (3) The transportation company to provide temporary loading chutes, and load hogs direct to the car through the temporary chutes or from wagons, keeping them away from the stockyards altogether. * * *"

The first carload of hogs consisted of about 146 to 148 head. This shipment was made on the 29th day of September, 1914.

The second shipment consisted of about 110 head of hogs, and was made on October 2, 1914. On both occasions Mr. Minton demanded clean cars that had been disinfected, but on both occasions the cars tendered were cars in which stock of some other kind had been shipped, and in which the old bedding remained, but covered, however, somewhat by fresh sand. Neither car was cleaned out or disinfected. Nor in either case was a chute prepared through which the hogs could be unloaded from the wagons into the car. But in both instances it became necessary to unload the hogs, first, in the stock yards, drive them through the stock yards pens, and into the cars through the usual chutes. There was no proof, however, that tended to show the character of stock that theretofore had been shipped in the cars. The appellee company offered no explanation on this subject. Nor did appellants offer any affirmative proof that tended to show that hogs of any character, infected or otherwise, had ever theretofore been in either car. Minton also testified, in substance, to the effect that he had not heard of any hog cholera in the section of country where he had made the purchases, and that so far as he knew the hogs were sound at the time they were shipped. The deposition also of a number of the farmers from whom purchases had been made to the same effect were also read in evidence.

Appellants urgently insist that the cars were unclean, and not disinfected, and that the undisputed failure of the appellee company to comply with the paragraphs of rule 31, which we have quoted, coupled with other proof to which we have above referred, and that cholera in the hogs soon subsequently developed, require a verdict in appellants' favor.

It was proved in behalf of appellee, however, by Minton himself, that one of the hogs out of the first shipment was left dead in the pens at Mt. Pleasant. Minton testified that this hog had become overheated and died therefrom, but other testimony in behalf of appellee was to the effect that the hog was thin and in such condition could not have died by reason of becoming too hot. It was further shown by a witness, whose qualification we think sufficient, although objected to, that this hog died from cholera. Yet further testimony undoubtedly tended to show that there was more or less of hog cholera in and about Omaha, where the second lot of hogs had been purchased, and that at least one of this number manifested symptoms of the disease, as given by veternarians who testified, before its purchase by Minton. There was testimony also on the part of one or more of the veternarians, to the effect that it takes a hog from eight to nine days to develop symptoms enough so that it will show the disease externally. It was also shown that of the second, or Omaha, shipment, at least one of the hogs manifested symptoms of cholera between the point of shipment and Ft.

Worth, and that at Ft. Worth several of the hogs, which were there unloaded, almost immediately manifested symptons of the disease and died, and that after the second load arrived at Shamrock they were unloaded and mixed with the hogs of the first shipment, and the greater number thereafter soon developed hog cholera and died.

The court seems to have carefully instructed the jury, and appellants made no complaint of the charge given upon the trial. The jury were charged, in substance, that it was the duty of appellee to comply with the requirements of rule 31, as we have quoted them, and that if the rule had not been complied with, and that the hogs shipped from Mt. Pleasant on September 29th were at the time free from the disease of cholera, and that they thereafter contracted and became infected with the germs of the disease from being loaded through defendant's pen at said station into a car which had not been thoroughly cleaned and disinfected, as provided for in the rule, that they find for the plaintiff as to this first shipment. They were further instructed that if they should find that the hogs in the second, or Omaha, shipment were at the time of their shipment free from the disease of cholera, and that by reason of the defendant's failure to furnish clean and disinfected cars they contracted the disease, or if said shipment was not infected until after they arrived at Shamrock, and that the hogs of the second shipment there contracted the disease from the hogs contained in the first shipment, and that the hogs in the first shipment had contracted the disease from being shipped in an unclean car at Mt. Pleasant, then, in either event, appellee would be liable for the resultant damage. The jury were further instructed, however, that if the first shipment was infected with the disease of cholera before they were delivered to the defendant at Mt. Pleasant, and did not contract or become infected therewith upon being loaded at the station through the defendant's pen into an unclean car, they would find for the defendant as to that shipment. A like instruction was given that specifically related to the second shipment. The court also, among other things, gave a special charge at appellee's request to the effect that if the hogs in question had the cholera prior to the time they were delivered to the railway company at Mt. Pleasant, and at Omaha, and said hogs died solely as a result from having the cholera, if any, prior to that time and prior to the time they were delivered to the St. Louis Southwestern Railway Company at said points of shipment, then it was the duty of the jury to return a verdict for the defendant, even though it might believe and find from the evidence that the defendant failed to comply with the provisions of rule 31. As stated, no exceptions were taken to these charges, and, in the light of the charges, it is evident that the jury concluded that the hogs in question were infected with cholera before their delivery to the appellee for shipment.

[1] It seems evident that the weight of appellants' contention that the evidence required a verdict and judgment in their favor rests upon the assumption that the appellee company violated rule 31 by furnishing unclean and nondisinfected cars for the shipment of the plaintiffs' hogs, and that such violation of the rule as a matter of law constitutes negligence for which the appellee company is liable. In proceeding to analyze this contention, it may be well to obtain as clear an understanding as we can of the terms "clean" and "disinfected." By an examination of the definition as given by Webster, it will be seen that the term "clean" is one of variable meaning, owing to the connection in which it is used. It may mean "free from dirt, filth, impurity, foreign or undesirable matter, soil, or stain; pure; as clean water." Or it may mean "without defilement, morally pure; as clean literature, a clean man." Or it may mean "ceremonially pure as conforming to the ceremonial law; said among the Jews of persons, animals, etc." Or "free from knot or knot holes; clear; smooth; as clean timber." Or "having no blemish or imperfections; complete; perfect; whole; as clean copy." Or "free from bungling; not awkward; dexterous; as a clean track." Or it may mean "completely cleared or rid of something; or affecting such clearance; as far as national institutions were concerned, the Thirty Years War made a clean sweep of Germany." The term "disinfected" is thus defined by Webster: "To remove from or destroy in (a substance) the poison of injurious or of contagious diseases; purified from infection."

Construing the two words together as used in the requirement of rule 31, "that cars assigned for the loading of stock hogs shall be thoroughly cleaned and disinfected," the term "clean" does not mean that the car must be entirely free from dirt, trash, or the like, but, on the contrary, that it must be free from infection. The term "disinfect" can have no application to a car not infected, and hence we do not think that we would be authorized to declare as a matter of law that the cars furnished for the shipment of the plaintiffs' hogs were not clean within the meaning of the rule. If they were clean within the meaning of the rule, no disinfection would be required, nor in such event could the disease which resulted in the death of plaintiffs' hogs have been communicated from such cars. Force is given to these constructions of the terms by one or more of the witnesses. For instance, Mr. Henderson, superintendent of the Ft. Worth Stockyards, testified, among other things, that:

"A car is called 'dirty' on account of it having been used below the quarantine. It is an infected car, with ticks; it is termed a dirty car because the government won't allow it to pass the quarantine line; a 'dirty car' does not mean

that it has a lot of dirt in it, but means an in-fected car."

All of the expert testimony was to the effect that hog cholera was produced by infection, and Dr. Lewis Crabb, in testifying on the subject, among other things, said:

"If hogs were shipped in a car which had old bedding in it, and I had no proof whatever that choleraed hogs had been shipped in it, there would be no evidence that would cause me to believe that the hogs would take cholera from it; that is, if sick hogs had not been shown to have been there. The bedding would make no difference if it had not been infected. It takes the excrement of the hog which is sick with cholera to infect the bedding."

[3, 4] How then are we to arrive at the first step in the process of determination? Must we say that, because the proof shows that the cars in which plaintiffs' hogs were shipped had old bedding in them and were not free from dirt, they were therefore infected? And then, having so determined, further infer that plaintiffs' hogs were infected with hog cholera from the infected cars? To do so, as it seems to us, is to base presumption upon presumption, which is never permitted in the law. G., C. & S. F. Ry. v. Davis, 161 S. W. 932; M. P. Ry. Co. v. Porter, 73 Tex. 304, 11 S. W. 324. But it is insisted that, because of the defendant's failure to explain the condition of the car, we are authorized to draw the inference that it was infected. It is true that it has been often held that a failure of a litigant to produce evidence within its power explaining a fact or facts unfavorable to it will authorize an inference detrimental to the litigant so failing. But in the case before us we must not lose sight of the fact that there is a very considerable array of evidence which tends to show that the hogs in question were infected with cholera before they were ever delivered to the initial carrier, and we must further bear in mind, as the court without objection instructed the jury, that the burden of proof was upon the plaintiffs to establish the material allegations of their petition. So that, in the state of the proof as it is before us, it can by no means be said with certainty and as a matter of law that unclean and nondisinfected cars was the proximate cause of the cholera that developed in the plaintiffs' hogs. We cannot say that the cars were infected merely because the defendant failed to disprove the fact. To do so would be a mere extension of the inferences or presumptions. The averment that the car was unclean was one of the material allegations of the plaintiffs' petition, and the burden of proof, as already stated, rested upon the plaintiffs throughout the cause. Clark v. Hills, 67 Tex. 141, 2 S. W. 356; Laing v. Sherley, 61 S. W. 532. The thought here intended to be presented, and that will hereinafter be further developed, may be illustrated by reference to the case of T. & P. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049. In that case, Fred and Charles Shoemaker were run over and killed by a passing train of the railway company during the night. Their presence upon the railway track and the circumstances at the time they were killed were unexplained. It was alleged, among other things, that the engineer in charge of the locomotive that ran over the boys was defective in vision, and that the company was guilty of negligence in retaining him in its employ. It was said:

"The unfitness of the engineer only affects the question as to whether or not a proper watch was kept along the track. The presumption is that there was, and it will hardly do to say that it is overcome by mere proof of the unexplained killing and of the engineer's defective vision. * * * The failure to keep a proper lookout, either from incapacity or other reason, could only be deemed the proximate cause of the deaths when it appeared that the keeping of it would have prevented the unfortunate occurrence, and no inference of this fact can be drawn from the evidence."

See, also, M. P. Ry. Co. v. Porter, 73 Tex. 304, 11 S. W. 324.

So that, if it be conceded that the cars in which the plaintiffs' hogs were shipped were in fact unclean and infected cars, the evidence as a whole yet leaves it in doubt whether the infected cars were the real cause of the damage to the plaintiffs' hogs. The jury may have found, as indeed they may well have found from the evidence as a whole, that both shipments of hogs were in fact infected with cholera before the time they were delivered to the appellant company, in which event, as the court without objection charged the jury, the plaintiffs were not entitled to recover.

[5] Appellants present several assignments to the action of the court in overruling their motion for a new trial, for the reason, as insisted, that the jury must have been misled by argument of defendant's counsel. There is, however, no bill of exception, or other evidence in the record proper of what the argument was. Its mere recitation in the motion for a new trial and here in the briefs cannot be accepted as establishing the argument urged. The court overruled these grounds of the motion which will authorize this court to presume that no such argument was made, even if the argument as presented in the briefs would otherwise have the tendency imputed to it.

The trial court also overruled the objections to the testimony of several witnesses, on the ground of a want of qualification; but the testimony relating to the qualification of the witness has all been examined, and we fail to find any prejudicial error on the part of the court in this respect.

All assignments of error are, accordingly, overruled, and the judgment affirmed.